UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

IN RE: AIR CRASH NEAR CLARENCE CENTER,          **DECISION AND ORDER**
NEW YORK, ON FEBRUARY 12, 2009,                          09-md-2085

This document relates to:
ALL CASES

## I. INTRODUCTION

Presently before this Court are the parties' choice-of-law motions filed in this

multidistrict litigation concerning the crash of Continental Connection Flight 3407.  On

February 12, 2009, while on final approach to the Buffalo Niagara International Airport,

Flight 3407 crashed into a house in Clarence Center, N.Y., killing 50 people (all 49 on

board and one in the house) and damaging neighboring property.

By order entered October 6, 2009, the United States Judicial Panel on Multidistrict

Litigation transferred all then-pending actions concerning the crash of Flight 3407 to this

Court for coordinated or consolidated pretrial proceedings, pursuant to 28 U.S.C. § 1407.

In Re Air Crash Near Clarence Ctr., N.Y., on Feb. 12, 2009, 655 F. Supp. 2d 1355, 1356

(J.P.M.L. 2009).  Subsequently-filed actions have also been transferred here.  To date, the

litigation encompasses individual cases commenced in Connecticut, Florida, New Jersey,

New York, and Pennsylvania.

In their Motions for the Application of a Federal Standard of Care (Docket No. 486[1])

and for a Determination of Applicable Law on Punitive Damages (Docket No. 437),

Defendants Pinnacle Airlines Corp. and its wholly-owned subsidiary, Colgan Air, Inc., argue

---

[1]Unless otherwise noted, all docket references are to the master multidistrict litigation docket —
09-md-2085.

that federal standards of care apply to Plaintiffs' state law negligence claims and that Virginia law governs punitive damages.  In their Cross Motion for the Application of New York law (Docket No. 579), Plaintiffs argue that New York law governs both the standards of care and punitive damages.  For the reasons discussed below, this Court finds that federal standards of care apply to Plaintiffs' state law negligence claims and that New York law applies to punitive damages.

## II.  DISCUSSION

**A.    Law Governing the Standard of Care**

Defendants seek application of federal standards of care on the theory that Congress intended the Federal Aviation Act of 1958 ("the Aviation Act"), 49 U.S.C. §§ 40101, et seq., and its associated regulations (e.g., 14 C.F.R. §§ 21-199, et seq.) to preempt all state law standards of care relating to air safety.  Defendants maintain that federal control over the nation's airspace is extensive and exclusive, and therefore, federal standards of care preempt individual state law and provide the relevant standards relating to aviation safety and aircraft operations.  Thus, rather than meet New York's reasonably-prudent-person standard, Defendants argue that Plaintiffs must instead prove that a violation of a federal standard of care (e.g., a federal statute or regulation) caused their alleged injuries.  Plaintiffs maintain that the Aviation Act does not preempt state law.

Congress's power to preempt state law derives from the Supremacy Clause of the United States Constitution, which provides that

> [t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the authority of the United States, shall be the supreme Law of the Land; and the Judges in every

> State shall be bound thereby; any Thing in the Constitution or
> Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2; see also Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981).

Federal preemption can be express or implied.  See N.Y. SMSA Ltd. P'ship v. Town of Clarkstown, 612 F.3d 97, 104 (2d Cir. 2010) (per curiam).  Express preemption exists when "a federal statute expressly directs that state law be ousted."  Ass'n of Int'l Auto. Mfrs. v. Abrams, 84 F.3d 602, 607 (2d Cir. 1996).  Implied preemption exists when there is evidence that Congress intended federal authority to displace state authority.  See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000).  Thus, implied preemption is "fundamentally a question of congressional intent."  Gerosa v. Savasta & Co., 329 F.3d 317, 323 (2d Cir. 2003) (citing N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995)); Pilot Life Ins. Co. v. Dedeauz, 481 U.S. 41, 45, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987) (Congressional intent is the "ultimate touchstone" of preemption analysis).  The analysis "begin[s] with the assumption that 'Congress does not intend to supplant state law.'"  Gerosa, 329 F.3d at 323-34 (examining preemption in the ERISA context) (citing Travelers, 514 U.S. at 654-55).

Defendants argue that the doctrine of field preemption requires the application of federal standards of care.  Field preemption is a form of implied preemption.  See English v. Gen. Elec. Co., 496 U.S. 72, 79-80, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990).  It "is inferred in cases where federal law is so pervasive that it leaves 'no room for supplementary state regulation' — where the federal law has fully occupied the field of

regulation." <u>U.S. Smokeless Tobacco Mfg. Co. v. City of N.Y.</u>, 703 F. Supp. 2d 329, 335 (S.D.N.Y. 2010) (quoting <u>Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.</u>, 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985)).  It is found where "the pervasiveness of the federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where 'the object sought to be obtained by the federal law and the character of obligations imposed by it . . . reveal the same purpose.'" <u>Air Transp. Ass'n of Am., Inc. v. Cuomo</u>, 520 F.3d 218, 220-21 (2d Cir. 2008) (quoting <u>Schneidewind v. ANR Pipeline Co.</u>, 485 U.S. 293, 300, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988).

If congressional intent to preempt is found, the next task is to determine the scope of the preemption: "The key question is thus at what point the state regulation sufficiently interferes with federal regulation that it should be deemed preempted." <u>Gade v. Nat'l Solid Wastes Mgmt. Ass'n</u>, 505 U.S. 88, 107, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992).

During the briefing of Defendants' present motion, the United States Court of Appeals for the Second Circuit resolved the first preemption inquiry, holding that "Congress has indicated its intent to occupy the entire field of aviation safety." <u>Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n</u>, 634 F.3d 206, 212 (2d Cir. 2011).  In so doing, the Second Circuit joined its sister circuits in concluding that Congress intended the Aviation Act to entirely preempt state regulation of air safety.  <u>See, e.g.</u>, <u>U.S. Airways, Inc. v. O'Donnell</u>, 627 F.3d 1318, 1326 (10th Cir. 2010); <u>Montalvo v. Spirit Airlines</u>, 508 F.3d 464, 468 (9th Cir. 2007); <u>Greene v. B.F. Goodrich Avionics Sys., Inc.</u>, 409 F.3d 784, 795 (6th Cir. 2005); <u>Abdullah v. Am. Airlines, Inc.</u>, 181 F.3d 363, 367-68 (3d Cir. 1999); <u>French v. Pan Am Express, Inc.</u>, 869 F.2d 1, 5 (1st Cir. 1989); <u>see also</u> <u>Curtin</u>

v. Port Auth. of N.Y. & N.J., 183 F. Supp. 2d 664, 671 (S.D.N.Y. 2002).  The remaining question is whether Congress's preemption of air safety encompasses the standards of care applicable to Plaintiffs' state law negligence claims.[2]  Goodspeed, 634 F.3d at 210-11 (explaining the preemption analysis as twofold: "we must determine not only Congressional intent to preempt, but also the scope of that preemption").

Plaintiffs' state law negligence claims would ordinarily require application of the reasonably-prudent-person standard of care to determine whether Defendants breached their duties.  See Havas v. Victory Paper Stock Co., 402 N.E.2d 1136, 1138-39 (N.Y. 1980).  Plaintiffs generally allege that Defendants' negligent acts included hiring, training, and supervising the flight crew, and creating and implementing various safety programs. Plaintiffs also allege that Defendants are responsible for the flight crew's negligent operation of Flight 3407.  There is little question that these claims directly implicate air safety, and indeed, there is no argument from Plaintiffs that their claims fall outside the air safety field.

The Aviation Act "was passed by Congress for the purpose of centralizing in a single authority — indeed, in one administrator — the power to frame rules for the safe and efficient use of the nation's airspace."  Air Line Pilots Ass'n., Int'l v. Quesada, 276 F.2d 892, 894 (2d Cir. 1960).  Congress directed the Administrator of the Federal Aviation Administration to develop safety standards and regulations governing specific areas of air safety, as well as "other practices, methods, and procedures the Administrator finds

---

[2]Defendants do not contend that the Aviation Act preempts state law causes of action or remedies or that the Aviation Act provides an independent cause of action.  Rather, they argue only that the state standards of care applicable to Plaintiffs' claims are preempted.

necessary for safety in air commerce and national security." 49 U.S.C. § 44701(a)(5). Title 14 of the Code of Federal Regulations contains these regulations.

Federal regulation of this field is extensive and exclusive: "The [Aviation Act] and its corresponding regulations, in prescribing a standard of care for the safety of airline travel, has created an 'overarching general standard of care.'" See Shupert v. Cont'l Airlines, Inc., No. 00 Civ. 2743 (LMM), 2004 WL 784859, at *6 (S.D.N.Y. Apr. 12, 2004) (citing Abdullah, 181 F.3d at 365). The general standard of care is that "[n]o person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another." 14 C.F.R. § 91.13 (a). This general standard is supplemented by the numerous specific safety regulations set forth in Title 14. See Curtin, 183 F. Supp. 2d at 668 (finding that the federal regulations set forth an "array of specific safety standards" for the aviation industry). Applying state law standards of care would interfere with these regulations and potentially subject airlines and related entities to 50 different standards.

Accordingly, following Goodspeed, this Court finds that the Aviation Act and its accompanying federal regulations preempt state regulation of the air safety field, including state standards of care. Federal laws and regulations exclusively occupy the field of air safety and therefore apply to Plaintiffs' claims, which directly implicate that field. See Aldana v. Air E. Airways, Inc., 477 F. Supp. 2d 489, 493 (D. Conn. 2007) (applying federal standard of care to state negligence claims arising out of aircrash); Shupert, 2004 WL 784859, at *5-6 (applying federal standard of care to claims involving air safety). State law causes of action and remedies remain available, however, under the Aviation Act's savings clause, which provides that "a remedy under this part is in addition to any other remedies provided by law." 49 U.S.C. § 40120 (c). Thus, if Plaintiffs prove that Defendants were

negligent, as governed by federal standards of care, they may pursue remedies under New York law.  See Aldana, 477 F. Supp. 2d at 493.

**B.    Law Governing Punitive Damages**

Defendants maintain that Virginia law governs punitive damages; Plaintiffs maintain that New York law governs.  Virginia caps total punitive damages at $350,000; New York has no cap.  See VA. Code Ann. § 8.01-38.1.  There is thus an actual conflict of laws.  See Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998) (noting that in New York, "the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws").

When faced with such a conflict of laws, a federal court exercising diversity jurisdiction in multidistrict litigation transferred to it under 28 U.S.C. § 1407 must apply the choice-of-law rules of the states in which the individual actions were commenced.  Int'l Paper Co. v. Ouellette, 479 U.S. 481, 501, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987); Klaxon Co. v. Stentor Elec. Mfg., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); In re Air Crash Disaster Near Chicago, Ill. on May 25, 1979, 644 F.2d 594, 610 (7th Cir. 1981) (noting that "the choice-of-law rules to be used are those choice-of-law rules of the states where the actions were originally filed"); In re Air Crash Disaster at Boston, Mass. on July 31, 1973, 399 F. Supp. 1106, 1108 (D.Mass. 1975) (similar).  The task is to determine what law each of the forum states would apply in this situation.  See O'Rourke v. E. Air Lines, Inc., 730 F.2d 842, 847 (2d Cir. 1984), abrogated on other grounds by Salve Regina Coll. v. Russell, 499 U.S. 225, 230, 111 S.Ct. 1217, 113 L.Ed.2d (1991).

Individual actions in this case were filed in five states: Connecticut, Florida, New Jersey, New York, and Pennsylvania.  Defendants are not domiciled in any of these states.

Colgan is a Virginia corporation, reportedly had its principal place of business in Virginia at the time of the aircrash, and now has its principal place of business in Tennessee. Pinnacle is a Delaware corporation with its principal place of business in Tennessee.[3]

Analysis of each forum state's choice-of-law rules follows, beginning with New York, the state in which the aircrash occurred and in which most of the individual actions were filed.

### 1.    New York Choice-of-Law

Historically, New York resolved conflict-of-law issues in tort cases by reflexively applying the law of the place of the wrong — *lex loci delicti*.  See Cooney v. Osgood Mach., Inc., 612 N.E.2d 277, 280 (N.Y. 1993); Schultz v. Boy Scouts of Am., Inc., 480 N.E.2d 679, 683 (N.Y. 1985).  In 1963, however, the New York Court of Appeals departed from this doctrine and developed a more flexible approach in a case involving New York parties who sustained injuries in a car accident in Ontario, Canada.  Babcock v. Jackson, 191 N.E.2d 279, 283-84 (N.Y. 1963).  Instead of automatically applying *lex loci delicti*, the Court of Appeals held that the law of the jurisdiction having the greatest concern with the specific issue in conflict should control.  Id. at 283.  The court found that the only contact with Ontario was "purely adventitious," and that the significant New York contacts warranted the application of New York law.  Id. at 284.  *Lex loci delicti* was therefore not applied.

Through refinement in a number of guest-statute tort cases similar to Babcock,[4] the predominant conflict-of-laws analysis for New York tort cases became the present-day

---

[3]No party asserts that Delaware or Tennessee law governs.

[4]See, e.g., Tooker v. Lopez, 249 N.E.2d 394 (N.Y. 1969); Milller v. Miller, 237 N.E.2d 877 (N.Y. 1968); Farber v. Smolack, 229 N.E.2d 36 (N.Y. 1967); Macey v. Rozbicki, 221 N.E.2d 380 (N.Y. 1966).

"interest analysis," which gives "controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation."  See Cooney, 612 N.E.2d at 280; Schultz, 480 N.E.2d at 684; Babcock, 191 N.E.2d at 283; Padula v. Lilarn Props. Corp., 644 N.E.2d 1001, 1002 (N.Y. 1994) ("In the context of tort law, New York utilizes interest analysis to determine which of two competing jurisdictions has the greater interest in having its law applied in the litigation."); GlobalNet Financial.com, Inc. v. Frank Crystal & Co., 449 F.3d 377, 384 (2d Cir. 2006) (recognizing that New York uses the "interest analysis" test to resolve conflict of laws in tort actions).

Under "interest analysis," "the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort."  Schultz, 480 N.E.2d at 684.  But *lex loci delicti* was not discarded altogether.  With the shift to "interest analysis," "[a]n immediate distinction was drawn between laws that regulate primary conduct (such as standards of care) and those that allocate losses after the tort occurs (such as vicarious liability rules)."  Cooney, 612 N.E.2d at 280.  "Conduct-regulating rules have the prophylactic effect of governing conduct to prevent injuries from occurring."  Padula, 644 N.E.2d at 1002.  Consequently, when conduct-regulating laws are in conflict, *lex loci delicti* remains the general default:  "[i]f conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."  Id. (stating that for standards of conduct, "the law of the place of the tort governs"); see also Babcock, 191 N.E.2d at 284 ("[w]here the issue involves standards of conduct, it is more than likely that it is the law of the place of the tort which will be controlling").

9

Punitive damages are recognized in this circuit (and New York) as conduct-regulating, not loss-allocating.[5]  See In re Sept. 11th Litig., 494 F. Supp. 2d 232, 239 (S.D.N.Y. July 3, 2007) (noting that "[t]he purpose of punitive damages is to regulate standards of conduct" and applying *lex loci delicti* to the plaintiff's punitive damages claims); Guidi v. Inter-Continental Hotels Corp., No. 95 Civ. 9006(LAP), 2003 WL 1907901, at *3 (S.D.N.Y. Apr. 16, 2003) (collecting cases).  Thus, unless there is good reason not to apply *lex loci delicti*, New York law should govern.

The question now before this Court is whether there is good reason to depart from *lex loci delicti*, or in other words, whether Virginia has a greater interest than New York in having its punitive damages law applied.[6]  "Interest analysis" requires that this Court examine the purpose of the law in conflict (and whether it is conduct-regulating or loss-allocating) and identify the jurisdiction in which the significant contacts relating to the law occurred.  See Dobelle v. Nat'l R.R. Passenger Corp., 628 F. Supp. 1518, 1528 (S.D.N.Y. 1986) (finding that "interest analysis" applies to determining which state's law of punitive damages should govern in a particular case); Padula, 644 N.E.2d at 1002.

---

[5]When loss-allocating laws conflict, New York courts apply the Neumeier factors to resolve the choice-of-law question.  See Neumeier v. Kuehner, 286 N.E.2d 454, 457-58 (N.Y. 1972).

[6]The question of what law governs compensatory damages is not before this Court at this time.  Nonetheless, the possibility that one state's law could apply to punitive damages and another's to compensatory damages is permitted under the doctrine of *depecage*, which "recognizes that in a single action different states may have different degrees of interest with respect to different operative facts and elements of a claim or defense."  Simon v. Philip Morris, Inc., 124 F. Supp. 2d 46, 75 (E.D.N.Y. 2000); In re Air Crash at Belle Harbor, N.Y. on Nov. 12, 2001, No. MDL 1448 (RWS), 2006 WL 1288298, at *23 (S.D.N.Y. May 9, 2006) ("Since punitive damages serve a completely different purpose than compensatory damages, it is only logical that courts have determined that the issue of punitive damages is distinct from the issue of compensatory damages and, therefore, the application of different laws to these different issues may be appropriate.").  Bifurcating the damages choice-of-law questions is therefore permitted, since *depecage* eliminates the risk of impermissibly inconsistent determinations.

"In deciding which state has the prevailing interest, we look only to those facts or contacts that relate to the purpose of the particular laws in conflict." AroChem Int'l, Inc. v. Buirkle, 968 F.2d 266, 270 (2d Cir. 1992) (citing Schultz, 480 N.E.2d at 684).  Punitive damages "are aimed at deterrence and retribution." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).  They may properly be awarded "to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 568, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); see also Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 19, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) ("[P]unitive damages are imposed for purposes of retribution and deterrence.").

In aircrash cases, the plaintiff's domicile is ordinarily of little concern in determining which state has the greatest interest in punishing and deterring unlawful conduct. See, e.g., Deutsch v. Novartis Pharm. Corp., 723 F. Supp. 2d 521, 524-26 (E.D.N.Y. 2010) (holding that state where corporate misconduct occurred had more significant interest than state of the plaintiff's domicile); In re Air Crash Disaster at Sioux City, Iowa, on July 19, 1989, 734 F. Supp. 1425, 1430 (N.D. Ill. 1990) (finding that a choice-of-law question concerning punitive damages "depends entirely on activities conducted by defendants" with "no role" for the plaintiff's domicile); Dobelle, 628 F. Supp. at 1528-29 ("The interest of the plaintiff's domicile has little relevance.").

In addition, the location of the aircrash itself is generally not significant because it is often fortuitous. See Pescatore v. Pan Am. World Airways, Inc., 97 F.3d 1, 13 (2d Cir. 1996) ("In a disaster befalling a plane aloft, the place of the crash is often random . . . and the sovereignty in which the accident occurs has little interest in applying its substantive

11

law to the case."); Saloomey v. Jeppesen & Co., 707 F.2d 671, 675 (2d Cir. 1983) (commenting that "aviation accidents — especially those occurring in interstate air travel — more frequently pose situations in which the place of actual injury is wholly fortuitous and unimportant"); Dickerson v. USAir, Inc., No. 96 Civ. 8560(JFK), 2001 WL 12009, at *5, *9 n.7 (S.D.N.Y. Jan. 4, 2001); Dobelle, 628 F. Supp. at 1529 (finding accident fortuitous when likelihood of it occurring elsewhere was just as great as it occurring where it did).

Except as it relates to the ground victims, the crash of Flight 3407 was largely fortuitous. Nothing about the crash suggests that it could only have occurred where it did; it could just as likely have occurred in New Jersey, Pennsylvania, or any other state where Colgan's allegedly ill-trained flight crews operated a Q400 aircraft. Nonetheless, the fortuitousness of the aircrash alone does not necessarily warrant departure from the rule of *lex loci delicti*. See O'Rourke, 730 F.2d at 849 (stating that claims arising out of an aircrash do not require a departure from *lex loci delicti* simply because of the transitory nature of the tort).

Thus, the place of the wrongful conduct and tort take on the most significance. See Deutsch, 723 F. Supp. 2d at 525 (finding that for a punitive damages conflict-of-laws issue, "the law of the jurisdiction where the conduct occurred should apply"). Plaintiffs argue that the place of the tort is quite obviously New York, because that is where Colgan's flight crew crashed Flight 3407 into the Wielinski house, causing death and property damage. In Plaintiffs' view, it is "unthinkable" that any law other than New York's could apply in such a circumstance. Defendants advance a narrower view, urging that only the location of the acts underlying Plaintiffs' punitive damages allegations should be considered, to the exclusion of the location of the aircrash. This view has support in federal case law. See

12

Deutsch, 723 F. Supp. 2d at 525 ("for purposes of the choice of law analysis, the relevant contacts are those that relate to the alleged conduct giving rise to [the plaintiff's] claims for punitive damages"); Belle Harbor, No. MDL 1448(RWS), 2006 WL 1288298, at *24 (S.D.N.Y. May 9, 2006) ("the dominant factors should be those that touch on the defendants' actions"); see also In re Aircrash Disaster Near Roselawn, Ind. on Oct. 31, 1994, No. 95 C 4593, MDL 1070, at *2 (N.D.Ill Sept. 9, 1997) ("The most important contacts in determining the punitive damages law to be applied in an aircrash case are (1) the defendant's principal place of business, and (2) the place where the misconduct that is the subject of the punitive damages claim took place.").  New York law, and its general adherence to *lex loci delicti* in conduct-regulating choice-of-law situations, however, is not so restrictive, preserving the location of the tort as a significant contact.

With these standards in mind, this Court finds that a weighing of the significant contacts results in the conclusion that New York has a greater interest than Virginia in seeing its law applied to punitive damages in this case.

First, there is no question that Flight 3407 crashed in New York, killing New York domiciliaries, damaging New York property, and requiring a significant emergency response from New York emergency personnel.  (See Affidavit of Justin Green ("Green Aff."), Docket No. 581, ¶¶ 2, 3, 6, 7, 8 (detailing the first responders).)  The aircrash brought trauma to the neighborhood in which it occurred and left an indelible mark on the entire Western New York community.  See In re Sept. 11th Litig., 494 F. Supp. 2d at 239-40 (considering the attack on the World Trade Center's effect on the community in conducting "interest analysis" under New York law).

Second, Plaintiffs' punitive damages claims are not limited to what occurred in

13

Defendants' boardroom.  Although Plaintiffs allege that punitive damages are warranted because Defendants failed to implement adequate safety programs and negligently hired and trained their flight crews — allegations that reasonably implicate corporate decision-making and policies — they also allege that Defendants failed to adequately supervise their flight crews and negligently operated an aircraft *in New York* in an unsafe manner, resulting in the crash of Flight 3407.  Essentially, Plaintiffs maintain that punitive damages are in order because Defendants recklessly operated Flight 3407 *in New York* with deficient, unfit pilots who lacked the fundamental knowledge and ability to safely operate the Q400 aircraft.  New York therefore has a compelling interest in seeing its punitive damages laws applied.

Third, although most of the corporate acts underlying Plaintiffs' punitive damages claims may have occurred in Virginia, not all of them did.  Colgan maintains that at the time of the aircrash, its headquarters, principal place of business, Systems Operations Control Center, training department, human resources department, and dispatchers were all located in Manassas, Virginia.  (Affidavit of David J. Harrington ("Harrington Aff."), Docket No. 632, ¶¶ 4, 6-8, 23.)  Moreover, Flight 3407 Captain Marvin Renslow's prescreening interview was conducted in Virginia, and Renslow and Flight 3407 First Officer Rebecca Shaw completed ground school training in Virginia.  (Harrington Aff., ¶¶ 11, 16.)  Further, Colgan's Chief Pilot and key corporate officers were all located in Virginia: Harry Mitchel (Vice President, Flight Operations); Dean Bandavanis (Director, Flight Operations); Dan Morgan (Vice President, Safety & Regulatory Compliance); Jeb Barrett (Director, Flight Standards); Darrell Mitchell (Director, Crew Member and Dispatch Training); Chuck Colgan, Jr. (Manager, Pilot Recruiting); and Cathy Angelo (Pilot Recruiter).  (Harrington

14

Aff., ¶¶ 9, 10, 17, 19-22, 24.)  Finally, Colgan's Q400 manuals were developed, published, and distributed in Virginia.  (Harrington Aff., ¶ 25.)

But Plaintiffs have come forth with evidence that calls into question the notion that all relevant conduct occurred in Virginia.  For example, Colgan interviewed and tested Renslow in New York.  (Green Aff., ¶¶ 30, 32, 33; Harrington Aff., ¶¶ 12, 13.)  Colgan does business in New York, conducts pilot interviews and training in New York, maintains bases at LaGuardia and Albany airports in New York, schedules regular flights to and from New York, and operates its primary Q400 maintenance base in Albany, New York. (Green Aff., ¶¶ 9, 18, 20-22, 25, 30, 32, 33, 38.)  In addition, the Q400 aircraft operating as Flight 3407 had its last pre-crash maintenance check in New York on the day of the crash, including line checks on the ice detector probes and de-ice boots.  (Green Aff., ¶ 24.)  And certainly, all of the operational errors and omissions that Plaintiffs contend warrant the imposition of punitive damages occurred during the flight in New York.

In addition, Colgan employees responsible for enforcing Federal Aviation regulations and Colgan policies relating to pilot fatigue, illness, icing procedures, etc. were not located in Virginia, but in New Jersey, as was the Regional Chief Pilot to whom Renslow and Shaw reported.  (Green Aff., ¶¶ 46, 47.)  There is also evidence suggesting that corporate decisions could have been made in Tennessee, the location of Colgan's parent company (Pinnacle) and two of its corporate officers, and the place where the Q400 operating as Flight 3407 was registered.  (Green Aff., ¶¶ 12, 16, 17.)

Fourth, although relevant corporate decisions may have been made in Virginia, the alleged effect of those decisions came to disastrous fruition in New York.  "When the defendant's misconduct and the plaintiff's injury occur in different jurisdictions, the place

15

of the tort is the jurisdiction where 'the last event necessary' to make the defendant liable occurred."  In re Sept. 11th Litig., 494 F. Supp. 2d at 239 (citing Schultz, 480 N.E.2d at 683; In re Air Crash at Belle Harbor, N.Y. on Nov. 12, 2001, 2006 WL 1288298, at *28 (citing Schultz, 480 N.E.2d at 683).  The "last event necessary" in this case — the crash of Flight 3407 — obviously occurred in New York.

Fifth, it should be clear that this Court does not lightly dismiss Defendants' arguments that Virginia law should apply because of the number of significant contacts relating to punitive damages that occurred there.  As noted, focusing only on the location of the acts giving rise to the punitive damages claim is an approach that has been followed in some cases.  See, e.g., Dickerson, 2001 WL 12009, at *9; In re Air Crash Disaster at Sioux City, Iowa, on July 19, 1989, 734 F. Supp. at 1430.  But the theory underlying that approach — that the defendant's state of domicile has the greater interest in regulating the conduct of its residents — is severely undermined where as here, the defendant has changed domiciles.  This Court is aware that the defendant's place of domicile at the time of the event controls in the choice-of-law analysis, see In re Air Crash Disaster Near Chicago, Ill. on May 25, 1979, 644 F.2d at 618, but that does not change the reality that when weighed against New York's interest, Virginia's is not nearly as strong as it would be if Colgan's principal place of business was still located within its borders.

Finally, whether cases that focus their choice-of-law analysis on the location of the contacts giving rise to the punitive damages claims present a better rule is not the issue.  As the court in Belle Harbor noted, a district court's task is to determine how the forum court would resolve the issue, not to apply a rule that the court might think better or wiser.  See In re Air Crash at Belle Harbor, N.Y. on Nov. 12, 2001, 2006 WL 1288298, at *29.  In

this Court's view, a New York court would find that New York's interest "in the admonitory effect that applying its law will have on similar conduct in the future" is of critical importance and outweighs Virginia's interest.  See Schultz, 480 N.E.2d at 684-85.  This is especially true because New York regards conduct-regulating measures, such as punitive damages, as designed to prevent injuries from occurring.  Padula, 644 N.E.2d at 1002.  New York therefore has the predominant concern and greater interest in regulating the conduct of those who act within its jurisdiction, as Defendants did here.

Accordingly, this Court finds no cause to depart from New York's general rule of applying *lex loci delicti* to choice-of-law questions involving conduct-regulating laws.  Nor would a New York court judging these facts and circumstances displace its own punitive damages law in favor of that of a foreign defendant's domicile, where New York is the site of the aircrash, the location of misconduct, the domicile of the majority of the decedents and plaintiffs, and the situs of property damage.  See Babcock, 191 N.E.2d at 284 ("It is appropriate to look to the law of the place of the tort so as to give effect to that jurisdiction's interest in regulating conduct within its borders, and it would be almost unthinkable to seek the applicable rule in the law of some other place.").

New York law shall apply to punitive damages.

### 2.    Connecticut, Florida, New Jersey, and Pennsylvania Choice-of-Law

The choice-of-law rules of these four states are substantially similar such that they can be discussed together.

Connecticut and Florida both apply the "most significant relationship" test set forth in the Restatement (Second) of Conflict of Laws (1971) to choice-of-law questions in tort cases.  See Jaiguay v. Vasquez, 948 A.2d 955, 972-73 (Conn. 2008) (citing O'Connor v.

O'Connor, 519 A.2d 13, 21-22 (Conn. 1986); Bishop v. Fla. Specialty Paint Co., 389 So.2d 999, 1001 (Fla. 1980)); See Restatement (Second) of Conflict of Laws ("Restatement") § 145 (1) (1971) ("The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6 [of the Restatement]."). New Jersey and Pennsylvania adhere nominally to a combination of government interest analysis and the Restatement, but in essence apply the principles of the Restatement. See P.V. ex rel. T.V. v. Camp Jaycee, 962 A.2d 453, 460 (N.J. 2008); Griffith v. United Air Lines, Inc., 203 A.2d 796, 801-07 (Pa. 1964); Lacey v. Cessna Aircraft Co., 932 F.2d 170, 187 (3d Cir. 1991) (discussing the Pennsylvania test). Thus, for all practical purposes, each of the four states applies the Restatement.

Like New York's "interest analysis," the Restatement approach requires that certain contacts be weighed against choice-of-law principles. See Restatement §§ 6, 145. In tort cases, the following contacts are to be considered according to their relative importance with respect to the issue in conflict:

     (1)    the place where the injury occurred,

     (2)    the place where the conduct causing the injury occurred,

     (3)    the domicil, residence, nationality, place of incorporation and place of business of the parties, and

     (4)    the place where the relationship, if any, between the parties is centered.

Restatement § 145 (2).

Once these contacts are determined, they must be weighed against the following

choice-of-law principles:

> (1)     A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
>
> (2)     When there is no such directive, the factors relevant to the choice of the applicable rule of law include
>
>> (a)     the needs of the interstate and international systems,
>>
>> (b)     the relevant policies of the forum,
>>
>> (c)     the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>>
>> (d)     the protection of justified expectations,
>>
>> (e)     the basic policies underlying the particular field of law,
>>
>> (f)     certainty, predictability and uniformity of result, and
>>
>> (g)     ease in the determination and application of the law to be applied.

Restatement § 6.

For principally the same reasons articulated in the discussion of New York's choice-of-law rules, this Court finds that examination of the Restatement factors leads to the conclusion that New York has the "most significant relationship to the occurrence and the parties," such that New York law governs.  New York is the place of the injury.  New York is the place where conduct causing injury occurred (although conduct occurred in Virginia,

as well).  New York is the domicile of a majority of the decedents and plaintiffs.[7]  And New York is the place where the parties' relationship is arguably centered, given that Colgan was to fly the decedents to Buffalo, N.Y., although the center of the relationship could also be where each decedent purchased his or her ticket, information which has not been provided to this Court.

Again, this Court recognizes that the location of the conduct underlying a punitive damages claim is a significant factor in the choice-of-law analysis, as recognized by the Restatement.  See Restatement § 145 (2) cmt. e.  But as noted above, not all of the conduct relating to punitive damages occurred in Virginia, as Defendants contend. Significant conduct also occurred in New York, not the least of which occurred during the operation of the ill-fated flight.  It therefore cannot be said that all conduct is localized in Virginia, and for that reason, the place of the conduct is not determinative in this case as Defendants argue.

Application of New York law to punitive damages in this case also comports with the choice-of-law principles set forth in the Restatement.  New York's policy of regulating conduct within its borders through uncapped punitive damages is served; the justified expectations of an airline operating in New York and passengers flying into New York are protected; Virginia's interest in seeing its law applied is not discredited, but is decreased because Colgan no longer maintains its principal place of business there; and application of New York law based on these facts serves the interests of certainty, predictability, and

---

[7]For the reasons already stated, the fact that some of the decedents and plaintiffs are domiciled in Connecticut, Florida, New Jersey, and Pennsylvania is of little relevance to the instant choice-of-law question because none of those states is the site of the tort or a location in which any of the alleged misconduct occurred.

uniformity of result.  See Restatement § 6 (2).

Accordingly, this Court finds that applying the choice-of-law rules of Connecticut, Florida, New Jersey, and Pennsylvania yields the same result: New York has the greatest interest and most significant relationship to the crash of Flight 3407.  Each state would therefore find that New York law applies to punitive damages.

### 3.    Montreal and Warsaw Conventions

The parties agree that two of the individual actions — Perry, 09-CV-440S and Wang, 09-CV-769S — are governed by the Montreal or Warsaw Conventions governing international air travel.[8]  Neither Convention permits recovery of punitive damages.  See Pescatore, 97 F.3d at 14 (noting that punitive damages are unavailable in an action arising under the Warsaw Convention); Ginsberg v. Am. Airlines, No. 09 Civ. 3226(LTS)(KNF), 2010 WL 3958843, at *3 (S.D.N.Y. Sept. 27, 2010) (explaining that "Article 29 [of the Montreal Convention] precludes the recovery of 'punitive, exemplary or any other non-compensatory damages' for claims within its scope").  Consequently, punitive damages are not recoverable in Perry or Wang.

## IV.  CONCLUSION

For the reasons stated above, this Court finds that Congress has occupied the entire field of aviation safety through the Aviation Act, and therefore, federal standards of care preempt state standards as they relate to Plaintiffs' state negligence claims.  In addition, this Court finds that because New York has the greatest interest in applying its conduct-

---

[8]See Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999, S. Treaty Doc. No. 106-45, 1999 WL 33292734 (2000) ("Montreal Convention"); Convention for the Unification of Certain Rules Relating to International Transportation by Air, October 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934), note following 49 U.S.C. § 40105 ("Warsaw Convention").

regulating law, New York law governs punitive damages.  Finally, punitive damages are not recoverable in those cases arising under the Montreal or Warsaw Conventions.

## V.  ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for the Application of a Federal Standard of Care (Docket No. 486) is GRANTED.

FURTHER, that Defendants' Motion for a Determination of Applicable Law on Punitive Damages (requesting application of Virginia law) (Docket No. 437) is DENIED.

FURTHER, that Plaintiffs' Cross Motion for the Application of New York Law on Punitive Damages (Docket No. 579) is GRANTED.

SO ORDERED.


Dated: July 18, 2011
      Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Court
